ROBERTS, C. J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 20A66

_____

DEMOCRATIC NATIONAL COMMITTEE, ET AL. *v.*
WISCONSIN STATE LEGISLATURE, ET AL.

ON APPLICATION TO VACATE STAY

[October 26, 2020]

The application to vacate stay presented to JUSTICE KAVANAUGH and by him referred to the Court is denied.

CHIEF JUSTICE ROBERTS, concurring in denial of application to vacate stay.

In this case, as in several this Court has recently addressed, a District Court intervened in the thick of election season to enjoin enforcement of a State's laws. Because I believe this intervention was improper, I agree with the decision of the Seventh Circuit to stay the injunction pending appeal. I write separately to note that this case presents different issues than the applications this Court recently denied in *Scarnati* v. *Boockvar*, *ante*, at \_\_\_, and *Republican Party of Pennsylvania* v. *Boockvar*, *ante*, at \_\_\_. While the Pennsylvania applications implicated the authority of state courts to apply their own constitutions to election regulations, this case involves federal intrusion on state lawmaking processes. Different bodies of law and different precedents govern these two situations and require, in these particular circumstances, that we allow the modification of election rules in Pennsylvania but not Wisconsin.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20A66

_____

DEMOCRATIC NATIONAL COMMITTEE, ET AL. *v.*
WISCONSIN STATE LEGISLATURE, ET AL.

ON APPLICATION TO VACATE STAY

[October 26, 2020]

JUSTICE GORSUCH, with whom JUSTICE KAVANAUGH joins, concurring in denial of application to vacate stay.

Weeks before a national election, a Federal District Judge decreed that Wisconsin law violates the Constitution by requiring absentee voters to return their ballots no later than election day. The court issued its ruling even though over 30 States have long enforced the very same absentee voting deadline—and for understandable reasons: Elections must end sometime, a single deadline supplies clear notice, and requiring ballots be in by election day puts all voters on the same footing. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections," and States have always required voters "to act in a timely fashion if they wish to express their views in the voting booth." *Burdick* v. *Takushi*, 504 U. S. 428, 433, 438 (1992).

Why did the district court seek to scuttle such a long-settled tradition in this area? COVID. Because of the current pandemic, the court suggested, it was free to substitute its own election deadline for the State's. Never mind that, in response to the pandemic, the Wisconsin Elections Commission decided to mail registered voters an absentee ballot application and return envelope over the summer, so no one had to ask for one. Never mind that voters have also been free to seek and return absentee ballots since September. Never mind that voters may return their ballots not only by

mail but also by bringing them to a county clerk's office, or various "no touch" drop boxes staged locally, or certain polling places on election day.  Never mind that those unable to vote on election day have still other options in Wisconsin, like voting in-person during a 2-week voting period before election day.  And never mind that the court itself found the pandemic posed an insufficient threat to the health and safety of voters to justify revamping the State's in-person election procedures.

So it's indisputable that Wisconsin has made considerable efforts to accommodate early voting and respond to COVID.  The district court's only possible complaint is that the State hasn't done *enough*.  But how much is enough?  If Wisconsin's statutory absentee voting deadline can be discarded on the strength of the State's status as a COVID "hotspot," what about the identical deadlines in 30 other States?  How much of a "hotspot" must a State (or maybe some sliver of it) be before judges get to improvise?  Then there's the question what these new ad hoc deadlines should be.  The judge in this case tacked 6 days onto the State's election deadline, but what about 3 or 7 or 10, and what's to stop different judges choosing (as they surely would) different deadlines in different jurisdictions?  A widely shared state policy seeking to make election day real would give way to a Babel of decrees.  And what's to stop courts from tinkering with in-person voting rules too?  This judge declined to go that far, but the plaintiffs thought he should have, and it's not hard to imagine other judges accepting invitations to unfurl the precinct maps and decide whether States should add polling places, revise their hours, rearrange the voting booths within them, or maybe even supplement existing social distancing, hand washing, and ventilation protocols.

The Constitution dictates a different approach to these how-much-is-enough questions.  The Constitution provides that state legislatures—not federal judges, not state judges,

not state governors, not other state officials—bear primary responsibility for setting election rules. Art. I, §4, cl. 1. And the Constitution provides a second layer of protection too. If state rules need revision, Congress is free to alter them. *Ibid.* ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . "). Nothing in our founding document contemplates the kind of judicial intervention that took place here, nor is there precedent for it in 230 years of this Court's decisions.

Understandably so. Legislators can be held accountable by the people for the rules they write or fail to write; typically, judges cannot. Legislatures make policy and bring to bear the collective wisdom of the whole people when they do, while courts dispense the judgment of only a single person or a handful. Legislatures enjoy far greater resources for research and factfinding on questions of science and safety than usually can be mustered in litigation between discrete parties before a single judge. In reaching their decisions, legislators must compromise to achieve the broad social consensus necessary to enact new laws, something not easily replicated in courtrooms where typically one side must win and the other lose.

Of course, democratic processes can prove frustrating. Because they cannot easily act without a broad social consensus, legislatures are often slow to respond and tepid when they do. The clamor for judges to sweep in and address emergent problems, and the temptation for individual judges to fill the void of perceived inaction, can be great. But what sometimes seems like a fault in the constitutional design was a feature to the framers, a means of ensuring that any changes to the status quo will not be made hastily, without careful deliberation, extensive consultation, and social consensus.

Nor may we undo this arrangement just because we

might be frustrated. Our oath to uphold the Constitution is tested by hard times, not easy ones. And succumbing to the temptation to sidestep the usual constitutional rules is never costless. It does damage to faith in the written Constitution as law, to the power of the people to oversee their own government, and to the authority of legislatures, for the more we assume their duties the less incentive they have to discharge them. Last-minute changes to longstanding election rules risk other problems too, inviting confusion and chaos and eroding public confidence in electoral outcomes. No one doubts that conducting a national election amid a pandemic poses serious challenges. But none of that means individual judges may improvise with their own election rules in place of those the people's representatives have adopted.

# SUPREME COURT OF THE UNITED STATES

No. 20A66

DEMOCRATIC NATIONAL COMMITTEE, ET AL. *v.*
WISCONSIN STATE LEGISLATURE, ET AL.

ON APPLICATION TO VACATE STAY

[October 26, 2020]

JUSTICE KAVANAUGH, concurring in denial of application to vacate stay.

Approximately 30 States, including Wisconsin, require that absentee ballots be received by election day in order to be counted. Like most States, Wisconsin has retained that deadline for the November 2020 election, notwithstanding the COVID–19 pandemic. In advance of the November election, however, a Federal District Court in Wisconsin unilaterally changed the State's deadline for receipt of absentee ballots. Citing the pandemic, the court extended the deadline for receipt of absentee ballots by six days—from election day, November 3, to November 9, so long as the ballots are postmarked on or before election day, November 3.

The Seventh Circuit stayed the District Court's injunction, ruling that the District Court had violated this Court's precedents in two fundamental ways: first, by changing state election rules too close to an election; and second, by usurping the state legislature's authority to either keep or make changes to state election rules in light of the pandemic.

Applicants here ask that we vacate the Seventh Circuit's stay and reinstate the District Court's order extending the deadline for absentee ballots to be received in Wisconsin. The Court today denies the applications and maintains the Seventh Circuit's stay of the District Court's order. I agree with the Court's decision to deny the applications, and I write separately to explain why.

I

For three alternative and independent reasons, I conclude that the District Court's injunction was unwarranted.

*First*, the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents. This Court has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election—a principle often referred to as the *Purcell* principle. See *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*); see also *Merrill* v. *People First of Ala.*, *ante*, p. ___, (*Merrill II*); *Andino* v. *Middleton*, *ante*, p. ___; *Merrill* v. *People First of Ala.*, 591 U. S. ___ (2020) (*Merrill I*); *Clarno* v. *People Not Politicians*, 591 U. S. ___ (2020); *Little* v. *Reclaim Idaho*, 591 U. S. ___ (2020); *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ___ (2020) (*per curiam*) (*RNC*).

The Court's precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor. Lawmakers initially must make a host of difficult decisions about how best to structure and conduct the election. Then, thousands of state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards. And at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting.

Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences. If a court alters election laws near an election, election administrators must first understand the court's injunction,

then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes. It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent.

That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election. See *Purcell*, 549 U. S., at 4–5; *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 197 (2008) (plurality opinion). The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.

In this case, however, just six weeks before the November election and after absentee voting had already begun, the District Court ordered several changes to Wisconsin's election laws, including a change to Wisconsin's deadline for receipt of absentee ballots. Although the District Court's order was well intentioned and thorough, it nonetheless contravened this Court's longstanding precedents by usurping the proper role of the state legislature and rewriting state election laws in the period close to an election.

Applicants retort that the *Purcell* principle precludes an appellate court—such as the Seventh Circuit here—from overturning a district court's injunction of a state election

rule in the period close to an election.  That argument defies common sense and would turn *Purcell* on its head.  Correcting an erroneous lower court injunction of a state election rule cannot itself constitute a *Purcell* problem.  Otherwise, appellate courts could never correct a late-breaking lower court injunction of a state election rule.  That obviously is not the law.  To be sure, it would be preferable if federal district courts did not contravene the *Purcell* principle by rewriting state election laws close to an election.  But when they do, appellate courts must step in.  See, *e.g., Andino*, *ante,* p. ___; *RNC,* 589 U. S., at ___ (slip op., at 3).

*Second*, even apart from the late timing, the District Court misapprehended the limited role of the federal courts in COVID–19 cases.  This Court has consistently stated that the Constitution principally entrusts politically accountable state legislatures, not unelected federal judges, with the responsibility to address the health and safety of the people during the COVID–19 pandemic.

The COVID–19 pandemic has caused the deaths of more than 200,000 Americans, and it remains a serious threat, including in Wisconsin.  The virus poses a particular risk to the elderly and to those with certain pre-existing conditions.  But federal judges do not possess special expertise or competence about how best to balance the costs and benefits of potential policy responses to the pandemic, including with respect to elections.  For that reason, this Court's cases during the pandemic have adhered to a basic jurisprudential principle: When state and local officials "'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Andino*, *ante*, at 2 (KAVANAUGH, J., concurring in grant of application for stay).  It follows "that a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily 'should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public

health and is not accountable to the people.'" *Ibid.* (some internal quotation marks omitted). As the Seventh Circuit rightly explained, "the design of electoral procedures is a legislative task," including during the pandemic. *Democratic National Committee* v. *Bostelmann,* \_\_\_ F. 3d \_\_\_, \_\_\_ (Oct. 8, 2020).

Over the last seven months, this Court has stayed numerous federal district court injunctions that second-guessed state legislative judgments about whether to keep or make changes to election rules during the pandemic. See *Merrill II, ante,* p. \_\_\_; *Andino, ante,* p. \_\_\_; *Merrill I,* 591 U. S. \_\_\_; *Clarno,* 591 U. S. \_\_\_; *Little,* 591 U. S. \_\_\_; *RNC,* 589 U. S. \_\_\_.

To be sure, in light of the pandemic, some state legislatures have exercised their Article I, §4, authority over elections and have changed their election rules for the November 2020 election. Of particular relevance here, a few States such as Mississippi no longer require that absentee ballots be received before election day. See, *e.g.,* Miss. Code Ann. §23–15–637 (2020). Other States such as Vermont, by contrast, have decided not to make changes to their ordinary election rules, including to the election-day deadline for receipt of absentee ballots. See, *e.g.,* Vt. Stat. Ann., Tit. 17, §2543 (2020). The variation in state responses reflects our constitutional system of federalism. Different state legislatures may make different choices. Assessing the complicated tradeoffs involved in changing or retaining election deadlines, or other election rules, in light of public health conditions in a particular State is primarily the responsibility of state legislatures and falls outside the competence of federal courts.

Applicants respond that this principle of deference to state legislatures applies only when a state legislature has affirmatively made some changes, but not others, to the election code in light of COVID–19. And they say that Wis-

consin's legislature has not done so, unlike the South Carolina legislature in *Andino*, for example.  But the Wisconsin State Legislature's decision *not* to modify its election rules in light of the pandemic is itself a policy judgment worthy of the same judicial deference that this Court afforded the South Carolina legislature in *Andino*, *ante*, p. ___.  In short, state legislatures, not federal courts, primarily decide whether and how to adjust election rules in light of the pandemic.

*Third*, the District Court did not sufficiently appreciate the significance of election deadlines.  This Court has long recognized that a State's reasonable deadlines for registering to vote, requesting absentee ballots, submitting absentee ballots, and voting in person generally raise no federal constitutional issues under the traditional *Anderson-Burdick* balancing test.  See *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983); *Burdick* v. *Takushi*, 504 U. S. 428 (1992).

To state the obvious, a State cannot conduct an election without deadlines.  It follows that the right to vote is not substantially burdened by a requirement that voters "act in a timely fashion if they wish to express their views in the voting booth." *Burdick*, 504 U. S., at 438.  For the same reason, the right to vote is not substantially burdened by a requirement that voters act in a timely fashion if they wish to cast an *absentee ballot*.  Either way, voters need to vote on time.  A deadline is not unconstitutional merely because of voters' "own failure to take timely steps" to ensure their franchise.  *Rosario* v. *Rockefeller*, 410 U. S. 752, 758 (1973).  Voters who, for example, show up to vote at midnight after the polls close on election night do not have a right to demand that the State nonetheless count their votes.  Voters who submit their absentee ballots after the State's deadline similarly do not have a right to demand that the State count their votes.

For important reasons, most States, including Wisconsin, require absentee ballots to be *received* by election day, not

just *mailed* by election day. Those States want to avoid the chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election. And those States also want to be able to definitively announce the results of the election on election night, or as soon as possible thereafter. Moreover, particularly in a Presidential election, counting all the votes quickly can help the State promptly resolve any disputes, address any need for recounts, and begin the process of canvassing and certifying the election results in an expeditious manner. See 3 U. S. C. §5. The States are aware of the risks described by Professor Pildes: "[L]ate-arriving ballots open up one of the greatest risks of what might, in our era of hyperpolarized political parties and existential politics, destabilize the election result. If the apparent winner the morning after the election ends up losing due to late-arriving ballots, charges of a rigged election could explode." Pildes, How to Accommodate a Massive Surge in Absentee Voting, U. Chi. L. Rev. Online (June 26, 2020) (online source archived at www.supremecourt.gov). The "longer after Election Day any significant changes in vote totals take place, the greater the risk that the losing side will cry that the election has been stolen." *Ibid.*

One may disagree with a State's policy choice to require that absentee ballots be received by election day. Indeed, some States require only that absentee ballots be *mailed* by election day. See, *e.g.,* W. Va. Code Ann. §3–3–5(g)(2) (Lexis 2020). But the States requiring that absentee ballots be received by election day do so for weighty reasons that warrant judicial respect. Federal courts have no business disregarding those state interests simply because the federal courts believe that later deadlines would be better.

That constitutional analysis of election deadlines still applies in the pandemic. After all, during the pandemic, a State still cannot conduct an election without deadlines. And the States that require absentee ballots to be received

by election day still have strong interests in avoiding suspicions of impropriety and announcing final results on or close to election night.

To be sure, more people are voting absentee during the pandemic. But the State of Wisconsin has repeatedly instructed voters to request and mail their ballots well ahead of time, and the State has taken numerous steps to accommodate the increased number of absentee ballots. Moreover, the State now has some experience to draw upon when administering an election during the pandemic. Wisconsin conducted primary elections in April and August, and has incorporated the lessons from those experiences into its extensive planning for the November election. See Wisconsin Elections Commission, April 7, 2020 Absentee Voting Report 24 (May 15, 2020) (online source archived at www.supremecourt.gov). And that planning has paid off so far: For the November election, more than a million Wisconsin voters have *already* voted by absentee ballot.

In attempting to justify the District Court's injunction, Applicants also rely on this Court's decision in April regarding the Wisconsin primary election. They claim that the Court there approved the District Court's change of the deadline for receipt of absentee ballots in the primary election, so long as the ballots were postmarked by election day. *RNC*, 589 U. S. ___. That assertion is incorrect. In that case, this Court explicitly stated that the District Court's last-minute extension of the deadline for receipt of absentee ballots was "not challenged in this Court." *Id.*, at ___ (slip op., at 1).

In sum, the District Court's injunction was unwarranted for three alternative and independent reasons: The District Court changed the state election laws too close to the election. It misapprehended the limited role of federal courts in COVID–19 cases. And it did not sufficiently appreciate

the significance of election deadlines.[1]

## II

The dissent rejects all three of the above conclusions and applies the ordinary *Anderson-Burdick* balancing test for analyzing state election rules. In the dissent's view, the District Court permissibly concluded that the benefits of the State's deadline for receipt of absentee ballots are outweighed by the burdens of the deadline on voters. In light of the three alternative and independent conclusions outlined above, I do not think that we may conduct that kind

———————

[1] A *federal court's* alteration of state election laws such as Wisconsin's differs in some respects from a *state court's* (or state agency's) alteration of state election laws. That said, under the U. S. Constitution, the state courts do not have a blank check to rewrite state election laws for federal elections. Article II expressly provides that the rules for Presidential elections are established by the States "in such Manner as the *Legislature* thereof may direct." §1, cl. 2 (emphasis added). The text of Article II means that "the clearly expressed intent of the legislature must prevail" and that a state court may not depart from the state election code enacted by the legislature. *Bush* v. *Gore*, 531 U. S. 98, 120 (2000) (Rehnquist, C. J., concurring); see *Bush* v. *Palm Beach County Canvassing Bd.*, 531 U. S. 70, 76–78 (2000) (*per curiam*); *McPherson* v. *Blacker*, 146 U. S. 1, 25 (1892). In a Presidential election, in other words, a state court's "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush* v. *Gore*, 531 U. S., at 113 (Rehnquist, C. J., concurring). As Chief Justice Rehnquist explained in *Bush* v. *Gore*, the important federal judicial role in reviewing state-court decisions about state law in a federal Presidential election "does not imply a disrespect for state *courts* but rather a respect for the constitutionally prescribed role of state *legislatures*. To attach definitive weight to the pronouncement of a state court, when the very question at issue is whether the court has actually departed from the statutory meaning, would be to abdicate our responsibility to enforce the explicit requirements of Article II." *Id.*, at 115.

The dissent here questions why the federal courts would have a role in that kind of case. *Post*, at 11, n. 6 (opinion of KAGAN, J.). The answer to that question, as the unanimous Court stated in *Bush* v. *Palm Beach County Canvassing Bd.*, and as Chief Justice Rehnquist persuasively explained in *Bush* v. *Gore*, is that the text of the Constitution requires federal courts to ensure that state courts do not rewrite state election laws.

of open-ended balancing test in this case. But even on its own terms, the dissent's balancing analysis is faulty, in my respectful view.

Start by considering the implications of the dissent's analysis. In reinstating the District Court's order extending Wisconsin's deadline for receipt of absentee ballots, the dissent's approach would necessarily invalidate (or at least call into question) the laws of approximately 30 States for the upcoming election and compel all of those States to accept absentee ballots received after election day. The dissent's *de facto* green light to federal courts to rewrite dozens of state election laws around the country over the next two weeks seems to be rooted in a belief that federal judges know better than state legislators about how to run elections during a pandemic. But over the last several months, this Court has consistently rejected that federal-judges-know-best vision of election administration.

The dissent does not fully come to grips with the destabilizing consequences of its analysis, saying that the facts may differ in other States. But the key facts underlying the District Court's injunction are similar in other States: the existence of the virus and its effects on election workers, voters, mail systems, and in-person voting. The dissent's claim that its reasoning would not necessarily invalidate the absentee-ballot deadlines of approximately 30 other States therefore rings hollow.

Turning to the dissent's balancing analysis, the dissent does not sufficiently appreciate the necessity of deadlines in elections, and does not sufficiently account for all the steps that Wisconsin has already taken to help voters meet those deadlines.

The dissent claims that the State's election-day deadline for receipt of absentee ballots will "disenfranchise" some Wisconsin voters. But that is not what a reasonable election deadline does. This Court has long explained that a State's election deadline does not disenfranchise voters who

are capable of meeting the deadline but fail to do so.  See *Rosario*, 410 U. S., at 757–758.  In other words, reasonable election deadlines do not "disenfranchise" anyone under any legitimate understanding of that term.  And the dissent cannot plausibly argue that the absentee-ballot deadline imposed—and still in place as of today—in most of the States is not a reasonable one.  Those voters who disregard the deadlines or who fail to take the state-prescribed steps for meeting the deadlines may have to vote in person.  But no one is disenfranchised by Wisconsin's reasonable and commonplace deadline for receiving absentee ballots.  Indeed, more than *one million* Wisconsin voters have already requested, received, *and returned* their absentee ballots.

To help voters meet the deadlines, Wisconsin makes it easy to vote absentee and has taken several extraordinary steps this year to inform voters that they should request and return absentee ballots well before election day.

For starters, as the Seventh Circuit aptly noted, Wisconsin has "lots of rules" that "make voting easier than do the rules of many other states."  *Luft* v. *Evers*, 963 F. 3d 665, 672 (2020).  Wisconsin law allows voters to vote absentee without an excuse, no questions asked.  Wis. Stat. §6.85 (2017–2018).  Registered voters may request an absentee ballot by mail, e-mail, online, or fax.  Wisconsin Elections Commission, Absentee Voting, https://elections.wi.gov/voters/absentee.

Since August, moreover, the Wisconsin Elections Commission has been regularly reminding voters of the need to act early so as to avoid backlogs and potential mail delays.  See, *e.g.,* Wisconsin Elections Commission, Wisconsin Voting Deadlines and Facts for November 2020 (Aug. 20, 2020), http://elections.wi.gov/node/7039.  In August and September, for example, Wisconsin's chief elections official explicitly urged voters not to wait to request a ballot: "It takes time for Wisconsin clerks to process your request.  Then it may take up to seven days for you to receive your ballot in

the mail.  It can then take another seven days for your ballot to be returned by mail."  Wisconsin Elections Commission, Wisconsin Mails Voting Information to Registered Voters (Sept. 3, 2020), http://elections.wi.gov/node/7077.

Perhaps most importantly, in early September, Wisconsin decided to leave little to chance and mailed every registered voter in the State who had not already requested an absentee ballot (2.6 million of Wisconsin's registered voters) an absentee ballot application, as well as information about how to vote absentee.  *Ibid.*

Returning an absentee ballot in Wisconsin is also easy. To begin with, voters can return their completed absentee ballots by mail.  But absentee voters who do not want to rely on the mail have several other options.  Until election day, voters may, for example, hand-deliver their absentee ballots to the municipal clerk's office or other designated site, or they may place their absentee ballots in a secure absentee ballot drop box.  Some absentee ballot drop boxes are located outdoors, either for drive-through or walk-up access, and some are indoors at a location like a municipal clerk's office.  Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, et al. to All Wisconsin Election Officials (Aug. 19, 2020) (online source archived at www.supremecourt.gov).  The Wisconsin Elections Commission has made federal grant money available to local municipalities to purchase additional absentee ballot drop boxes to accommodate expanded absentee voting.

Alternatively, absentee voters may vote "in-person absentee" beginning two weeks before election day.  Wis. Stat. §6.86(1)(b).  A Wisconsin voter who votes "in-person absentee" fills out an absentee ballot in person at a municipal clerk's office or other designated location before election day.  Some municipalities have created drive-up absentee voting sites to allow voters to vote "in-person absentee" without leaving their cars.  See, *e.g.,* City of Madison Clerk's Office, In-Person Absentee Voting Hours and Locations

(online source archived at www.supremecourt.gov).

Finally, on election day, a voter may drop off an absentee ballot at a polling place until 8:00 p.m. Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, to Wisconsin Municipal Clerks (Mar. 31, 2020) (online source archived at www.supremecourt.gov).

In sum, as the Governor of Wisconsin correctly said back in March as the COVID–19 crisis broke: "The good news is that absentee voting in Wisconsin is really easy." Marley, The Deadline to Request an Absentee Ballot in Wisconsin Is Friday. Here's How You Do It., Milwaukee Journal Sentinel, Mar. 13, 2020 (online source archived at www.supremecourt.gov).

The current statistics for the November election bear out the Governor's statement that absentee voting in Wisconsin is "really easy." In huge and unprecedented numbers, Wisconsin voters have already taken advantage of the State's generous absentee voting procedures for the November election. As of October 26, 2020, the Wisconsin Elections Commission has mailed 1,706,771 absentee ballots to Wisconsin voters. And it has already received back from voters 1,344,535 completed absentee ballots. Wisconsin Elections Commission, Absentee Ballot Report—November 3, 2020 General Election (Oct. 26, 2020), https://elections.wi.gov/node/7207.

As those statistics suggest, the dissent's charge that Wisconsin has disenfranchised absentee voters is not tenable. As the Seventh Circuit explained, the "district court did not find that any person who wants to avoid voting in person on Election Day would be unable to cast a ballot in Wisconsin by planning ahead and taking advantage of the opportunities allowed by state law." *Bostelmann*, ___ F. 3d, at ___.

The dissent insists, however, that "tens of thousands" and perhaps even 100,000 votes will not be counted if we do not reinstate the District Court's extension of the deadline. *Post*, at 3 (opinion of KAGAN, J.). The District Court arrived

at the same prediction, but it was a prediction, not a finding of fact. Indeed, the District Court did not include this prediction in the facts section of its opinion. *Democratic National Committee* v. *Bostelmann*, ___ F. Supp. 3d ___, ___ (WD Wis., Sept. 21, 2020). For its part, the dissent makes the same prediction by looking at the number of absentee ballots that arrived after the primary election day in April. But in the April primary, the received-by deadline had been extended to allow receipt of absentee ballots after election day. The dissent's statistic tells us nothing about how many voters might miss the deadline when voters know that the ballots must be received by election day. To take an analogy: How many people would file their taxes after April 15 if the filing deadline were changed to April 21? Lots. That fact tells us nothing about how many people would file their taxes after April 15 if the deadline remained at April 15.

The dissent also seizes on the fact that Wisconsin law allows voters to request absentee ballots until October 29, five days before election day. But the dissent does not grapple with the good reason why the State allows such late requests. The State allows those late requests for ballots because it wants to accommodate late requesters who still want to obtain an absentee ballot so that they can drop it off in person and avoid lines at the polls on election day. No one thinks that voters who request absentee ballots as late as October 29 can both receive the ballots and *mail* them back in time to be received by election day. As we stated in April, "even in an ordinary election, voters who request an absentee ballot at the deadline for requesting ballots . . . will usually receive their ballots on the day before or day of the election." *RNC*, 589 U. S., at ___ (slip op., at 3). Rather, those late requesters would, after receiving the ballots, necessarily have to drop their absentee ballots off in person at one of the designated locations. In short, Wisconsin provides an option to request absentee ballots until October 29

for voters who decide relatively late in the game that they would prefer to avoid lines at the polls on election day.

The dissent's October 29-based argument falls short for another reason as well: The dissent's approach would actually penalize Wisconsin for being too generous with its absentee voting regime. Under the dissent's theory, if Wisconsin had just set a *more restrictive* deadline for voters to request absentee ballots—say, two weeks before election day—there presumably would not be a constitutional problem with the State's election-day deadline for receipt of absentee ballots. But it makes little sense to penalize Wisconsin for accommodating voters and making it easier for them to vote absentee and avoid lines on election day.

The dissent's rhetoric of "disenfranchisement" is misplaced for still another reason. As the dissent uses that term, the dissent's own position would itself "disenfranchise" voters. What about voters who request an absentee ballot after October 29? What about voters who mail their ballots after November 3? What about voters who mail their ballots by November 3 but whose ballots arrive after November 9? Even if we reinstated the District Court's order as the dissent would have us do, those votes would not count. The dissent's position would itself therefore "disenfranchise" some voters, at least as the dissent uses the term. All of which simply shows that the dissent's rhetoric of disenfranchisement is mistaken.

The dissent responds that I am just disagreeing with the facts found by the District Court. Not so. I do not disagree with any of the relevant historical facts that the District Court found and that the dissent highlights. The dissent, for example, calls attention to the District Court's finding that nearly two million Wisconsin voters in this election are likely to request mail ballots. I agree. Indeed, the Wisconsin Elections Commission has already sent nearly that number of absentee ballots to voters who have requested

them. The dissent notes that the influx of ballots has imposed a serious burden on some local election offices. I agree. The dissent points out that the District Court found that ballots can sometimes take two weeks to be sent and returned in light of Postal Service delays. I agree. The dissent highlights that the pandemic has gotten worse, not better, in Wisconsin over the last few weeks. I agree. And the dissent notes that the in-person voting option can pose a health risk to elderly and ill voters. I agree; I am fully aware of and sensitive to that reality.

Contrary to the dissent's attempt to characterize our disagreement as factual, the facts in this case are largely undisputed. I have zero disagreement with the dissent on the question of whether COVID–19 is a serious problem. It is. Instead, I disagree with some of the District Court's and the dissent's speculative predictions about how the voting process might unfold with an election-day deadline for receipt of absentee ballots. And I disagree with the District Court's and the dissent's legal analysis of whether, given the agreed-upon facts, the State has done enough to protect the right to vote under the Constitution and this Court's precedents, given the necessity of having election deadlines.

In short, I agree with the dissent that COVID–19 is a serious problem. But you need deadlines to hold elections— there is just no wishing away or getting around that fundamental point. And Wisconsin's deadline is the same as that in 30 other States and is a reasonable deadline given all the circumstances.

To be clear, in every election a voter who requests an absentee ballot, particularly a voter who waits until the last moments to request an absentee ballot, might not receive a ballot in time to mail it back in, or in some cases may not receive a ballot until after election day. Or in some cases, a voter may mail a completed ballot, but it may get delayed

and arrive too late to be counted.[2]  Indeed, in 2012 and 2016, the States rejected more than 70,000 ballots in each election because the ballots missed the deadlines.  U. S. Election Assistance Commission, 2012 Election Administration and Voting Survey 42 (2013); U. S. Election Assistance Commission, 2016 Election Administration and Voting Survey 11, 25 (2017).  But moving a deadline would not prevent ballots from arriving after the newly minted deadline any more than moving first base would mean no more close plays.  And more to the point, the fact that some ballots will be late in any system with deadlines does not make Wisconsin's widely used deadline facially unconstitutional.  See *Crawford*, 553 U. S., at 202–203.

Put another way, the relevant question is not whether any voter would ever miss the deadlines.  After all, in every deadline case, the answer would always be yes, and no election deadline would ever be permissible.  The proper question under the Constitution is whether the deadline is reasonable under the circumstances.  See *Rosario*, 410 U. S., at 760.  Again, Wisconsin's deadline is the same as that in about 30 other States for the November election and is reasonable, for the reasons I have explained.

In any event, if a Wisconsin voter does not receive an absentee ballot in time to cast it, the voter still has the option of voting in person.  And Wisconsin, like many other States, demonstrated in the April and August primary elections that it can run an in-person election in a way that is reasonably safe for Wisconsin voters, with socially distanced

——————

[2] In Wisconsin, a voter can track his or her ballot online.  MyVote Wisconsin, Track My Ballot, https://myvote.wi.gov/en-us/TrackMyBallot.  If a voter is concerned that the ballot may not be received in time, the voter can cancel the absentee ballot and request a new one or vote in person, as long as the voter meets the deadlines set by the municipality for doing so, which typically fall a few days before election day.  Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, to Wisconsin County Clerks et al. (Oct. 19, 2020) (online source archived at www.supremecourt.gov).

lines, mask requirements, and sanitizing protocols. The District Court acknowledged that in-person voting can be done "safely" again in November "if the majority of votes are cast in advance, sufficient poll workers, polling places, and PPE are available, and social distancing and masking protocols are followed." *Bostelmann*, ___ F. Supp. 3d, at ___. If a voter requests a ballot at the last minute—long after the State has told voters that they should request ballots—and if that voter does not receive a ballot by election day, the voter still has the option of voting in person. That said, the better option, as Wisconsin has repeatedly announced, is for voters who wish to vote absentee to request and submit their ballots well ahead of time. That is what tens of millions of voters across America—including more than one million voters in Wisconsin—have already done.

\*    \*    \*

For those reasons, I concur in the denial of the applications to vacate the stay.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20A66

———————

## DEMOCRATIC NATIONAL COMMITTEE, ET AL. *v.* WISCONSIN STATE LEGISLATURE, ET AL.

ON APPLICATION TO VACATE STAY

[October 26, 2020]

JUSTICE KAGAN, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, dissenting.

In April, residents of Wisconsin voted in presidential primaries. That election was one of the first during the COVID–19 pandemic, which has turned in-person voting (with its often-long lines, touch screens, and enclosed booths) into a health risk, especially for older and less healthy Americans. Given these emergency conditions, a district judge directed the State to accept mail ballots received in the six days after the polls closed. That extension of Wisconsin's ballot-receipt deadline ensured that COVID-related delays in the delivery and processing of mail ballots would not disenfranchise citizens fearful of voting in person. Because of the court's ruling, state officials counted 80,000 ballots—about five percent of the total cast—that were postmarked by Election Day but would have been discarded for arriving a few days later.

Today, millions of Wisconsin citizens are preparing to vote in the November election. But COVID is not over. In Wisconsin, the pandemic is much worse—more than 20 times worse, by one measure—than it was in the spring: The State's health department now reports a weekly average of 3,879 cases per day, compared to 175 per day when the April election took place. See Wisconsin Department of Health Services, COVID–19: Wisconsin Cases (Oct. 26, 2020), www.dhs.wisconsin.gov/covid-19/cases.htm. Indeed,

Wisconsin is one of the hottest of all COVID hotspots in the Nation. So rather than vote in person, many Wisconsinites will again choose to vote by mail. State election officials report that 1.7 million people—about 50 percent of Wisconsin's voters—have already asked for mail ballots. And more are expected to do so, because state law gives voters until October 29, five days before Election Day, to make that request.

To ensure that these mail ballots are counted, the district court ordered in September the same relief afforded in April: a six-day extension of the receipt deadline for mail ballots postmarked by Election Day. The court supported that order with specific facts and figures about how COVID would affect the electoral process in Wisconsin. See *Democratic National Committee* v. *Bostelmann*, ___ F. Supp. 3d ___, ___–___, ___–___, ___, 2020 WL 5627186, *6–*7, *9–*10, *21 (WD Wis., Sept. 21, 2020). The court found that the surge in requests for mail ballots would overwhelm state officials in the weeks leading up to the October 29 ballot-application deadline. And it discovered unusual delays in the United States Postal Service's delivery of mail in the State. The combination of those factors meant, as a high-ranking elections official testified, that a typical ballot would take a full two weeks "to make its way through the mail from a clerk's office to a voter and back again"—even when the voter instantly turns the ballot around. *Id.*, at ___, n. 10, 2020 WL 5627186, *5, n. 10. Based on the April election experience, the court determined that many voters would not even *receive* mail ballots by Election Day, making it impossible to vote in that way. And as many as 100,000 citizens would not have their votes counted—even though timely requested and postmarked—without the six-day extension. (To put that number in perspective, a grand total of 284 Wisconsin mail ballots were not counted in the 2016

election.[1])  In the court's view, the discarding of so many properly cast ballots would severely burden the constitutional right to vote.  The fit remedy was to create a six-day grace period, to allow those ballots a little extra time to arrive in the face of unprecedented administrative and delivery delays.

But a court of appeals halted the district court's order, and today this Court leaves that stay in place.  I respectfully dissent because the Court's decision will disenfranchise large numbers of responsible voters in the midst of hazardous pandemic conditions.

I

Start with this fact: The court of appeals did not dispute any of the district court's careful findings about the effect of COVID on voting in Wisconsin.  The appellate court did not question the health risks—now increasing daily—of in-person voting in the State, especially to senior citizens and those with some pre-existing conditions.[2]  It did not deny that, because of those dangers, state election offices will be swamped until the end of October by timely mail-ballot applications.  It did not contest that backlogs in those offices, combined with unusual delays in mail delivery, will prevent tens of thousands of Wisconsinites—through no fault of their own—from successfully casting a mail ballot.  Nor did the appellate court express doubt that disenfranchisement of that kind, and on that scale, imposes a severe burden on the right to vote.  See generally *Burdick* v. *Takushi*, 504

---

[1] See U. S. Election Assistance Commission, 2016 Election Administration and Voting Survey 25.

[2] See C. Cotti, B. Engelhardt, J. Foster, E. Nesson, & P. Niakamp, The Relationship Between In-Person Voting and COVID–19: Evidence From the Wisconsin Primary, NBER Working Paper No. 27187, p. 11 (rev. Oct. 2020) ("Across all models, we find an increase in the positive share of COVID–19 cases in the weeks following the election in counties that had more in-person votes per voting location, all else equal").

U. S. 428, 434 (1992).  In fact, the court never even addressed the constitutional issue.

How could that be?  In the appellate court's view, this Court's decision in *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*), prohibited the district court from modifying Wisconsin's election rules so close to (*i.e.,* six weeks before) Election Day.  See *Democratic National Committee* v. *Bostelmann*, ___ F. 3d ___, ___–___, 2020 WL 5951359, *1–*2 (CA7, Oct. 8, 2020) (*per curiam*); see also *ante*, at 2–4 (KAVANAUGH, J., concurring).  But that is a misunderstanding of *Purcell*'s message.  In fixating on timing alone, the court of appeals went astray.

The Court in *Purcell* considered an appellate decision reversing a district court's refusal to enjoin a voter identification law shortly before an election.  We vacated the decision because the court of appeals—much like the one here—failed to "give deference to [a district court's] discretion" in assessing the propriety of injunctive relief.  549 U. S., at 5.  In doing so, we briefly addressed how to "weigh" whether an injunction of an election rule should issue.  *Id.*, at 4.  A court, we counseled, must balance the "harms attendant upon issuance or nonissuance of an injunction," together with "considerations specific to election cases" that may affect "the integrity of our electoral processes."  *Ibid.*  Among those election-specific factors, we continued, was the potential for a court order, especially close to Election Day, to "result in voter confusion and consequent incentive to remain away from the polls."  *Id.*, at 4–5.

That statement, as the dissent below saw, "articulated not a rule but a caution."  ___ F. 3d, at ___, 2020 WL 5951359, *4 (Rovner, J., dissenting).  Last-minute changes to election processes may baffle and discourage voters; and when that is likely, a court has strong reason to stay its hand.  But not every such change poses that danger.  And a court must also take account of other matters—among them, the presence of extraordinary circumstances (like a

pandemic), the clarity of a constitutional injury, and the extent of voter disenfranchisement threatened. At its core, *Purcell* tells courts to apply, not depart from, the usual rules of equity. See, *e.g.*, *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 24 (2008) ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" (internal quotation marks omitted)). And that means courts must consider all relevant factors, not just the calendar. Yes, there is a danger that an autumn injunction may confuse voters and suppress voting. But no, there is not a moratorium on the Constitution as the cold weather approaches. Remediable incursions on the right to vote can occur in September or October as well as in April or May.

And so the district court rightly held here. It is hard to see how the extension of a ballot-receipt deadline could confuse citizens about how to vote: At worst, a voter not informed of the new deadline would (if she could) put her ballot in the mail a few days earlier than needed. Nor would that measure discourage Wisconsin citizens from exercising their right to the franchise. To the contrary, it would prevent the State from throwing away the votes of people actively participating in the democratic process. And what will undermine the "integrity" of that process is not the counting but instead the discarding of timely cast ballots that, because of pandemic conditions, arrive a bit after Election Day. *Purcell*, 549 U. S., at 4.[3] On the scales of both constitutional justice and electoral accuracy, protecting the

_____

[3] JUSTICE KAVANAUGH alleges that "suspicions of impropriety" will result if "absentee ballots flow in after election day and potentially flip the results of an election." *Ante*, at 7. But there are no results to "flip" until all valid votes are counted. And nothing could be more "suspicio[us]" or "improp[er]" than refusing to tally votes once the clock strikes 12 on election night. To suggest otherwise, especially in these fractious times, is to disserve the electoral process.

right to vote in a health crisis outweighs conforming to a deadline created in safer days.

Indeed, I see no more apt time for the district court to have issued its injunction than when it did. The court of appeals insisted that the injunction would better have come in May, a half-year before Election Day; then, the court said, the order "could not be called untimely." ___ F. 3d, at ___, 2020 WL 5951359, *2. But "untimely" can mean too early as well as too late. And a May order could have been premature, perhaps even foolishly so. At that time, the district court could not have known the course COVID would take. Cf. *FDA* v. *American College of Obstetricians & Gynecologists*, *ante*, p. ___ (instructing a district court to consider whether pandemic conditions have changed enough to warrant modifying an injunction). Nor could the court have known about the current ability of Wisconsin election offices or the Postal Service to handle increased demand for mail ballots. (Doubts about the Postal Service's delivery performance, for example, did not arise until August.) In waiting until late September, the district court resolved to base its ruling on concrete evidence—not on unfounded speculation.

And without *Purcell*, not much is left in the appellate court's opinion to justify its stay. That court separately argued that "the design of electoral procedures" is a solely "legislative task." ___ F. 3d, at ___, 2020 WL 5951359, *2; see also *ante*, at 4–6 (KAVANAUGH, J., concurring). But that is not so when those procedures infringe the constitutionally enshrined right to vote. See, *e.g.*, *Anderson* v. *Celebrezze*, 460 U. S. 780, 786 (1983) (invalidating a state filing deadline); *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 666 (1966) (invalidating a state poll tax); *Reynolds* v. *Sims*, 377 U. S. 533, 568 (1964) (invalidating state districting maps). To be sure, deference is usually due to a legislature's decisions about how best to manage the COVID pandemic. See *South Bay Pentecostal Church* v. *Newsom*, 590

U. S. ___, ___ (2020) (ROBERTS, C. J., concurring in denial
of application for injunctive relief) (slip op., at 2).  But the
Wisconsin legislature has not for a moment considered
whether recent COVID conditions demand changes to the
State's election rules; that body has not even met since
April.  Compare Litke, Fact Check: Wisconsin Legislators
Have Gone About 6 Months Without Passing a Bill, USA
Today, Oct. 7, 2020 (online source archived at www.su-
premecourt.gov) ("Wisconsin lawmakers have been among
the least active in the country, according to a database of
all COVID-related legislation across the country main-
tained by the National Conference of State Legislatures"),
with *Andino* v. *Middleton*, *ante*, p. ___ (staying an order en-
joining South Carolina's witness requirement for mail bal-
lots when that rule was part of a legislative package to ad-
just voting procedures in response to COVID).  And if there
is one area where deference to legislators should not shade
into acquiescence, it is election law.  For in that field politi-
cians' incentives often conflict with voters' interests—that
is, whenever suppressing votes benefits the lawmakers who
make the rules.

## II

JUSTICE KAVANAUGH's concurring opinion goes further
than the court of appeals.  Rather than relying on *Purcell*
and deference alone, he also concludes that Wisconsin's
election rules, as applied during the COVID pandemic, do
not violate the right to vote.  See *ante*, at 6–9.  That follows,
in his view, because voting by mail is "easy" in Wisconsin
and because in-person voting is "reasonably safe."  *Ante*, at
11, 12, 17.[4]  (In another concurrence, JUSTICE GORSUCH

———————

[4] Oddly, the concurrence suggests that no change in the State's ballot-
receipt deadline is needed because Wisconsin has "incorporated the les-
sons" from April's primary "into its extensive planning for the November
election."  *Ante*, at 8.  But the April election was conducted under the
same extended deadline that the Court today precludes.  See *supra*, at 1.
One might have thought the April election's principal lesson is that a

agrees.  *Ante*, at 1–2.)

The first problem with that reasoning is that the district court found to the contrary.  As this Court constantly states, a district court has the greatest familiarity with the facts in a case, because it oversees the development and presentation of evidence.  See, *e.g.*, *Purcell*, 549 U. S., at 5; see also Fed. Rule Civ. Proc. 52(a).  That is why the court of appeals rightly did not question any of the lower court's findings.  See *supra*, at 3.  And why the concurrence is wrong to take a different tack.

Recall that the district court's findings include the following.  See *supra*, at 2–3.  The COVID pandemic has been getting worse and worse in Wisconsin.  And as the State has "broken numerous new case records," in-person voting—according to credible expert testimony—creates a "significant [health] risk," especially for older and sicker citizens.  ___ F. Supp. 3d, at ___–___, 2020 WL 5627186, *9–*10.  For that reason, Wisconsinites have turned to the mails.  According to the state elections commission, close to 2 million people are likely to request mail ballots.  See *id.*, at ___, 2020 WL 5627186, *9.  (That is about double the number of already-returned ballots that the concurrence chooses to emphasize.  See *ante*, at 8, 11, 18.)  State election offices have not received the resources they need to deal with that influx of applications, and severe administrative backlogs have therefore developed.  See ___ F. Supp. 3d, at ___, 2020 WL 5627186, *9.  Postal Service delays, detailed by both state and federal officials, compound the risk that voters will be unable to return timely requested mail ballots by Election Day.  See *ibid.*  And if a voter discovers on Election Day that her mail ballot has not yet arrived, Wisconsin law prevents her from voting in person—even assuming she would undertake the risk.  See Wis. Stat. §6.86(6).  All these

slightly altered ballot-receipt deadline can save thousands of timely cast mail ballots from the garbage bin.

facts would mean, as the chair of the Wisconsin Elections Commission testified, that many thousands of timely requested and postmarked votes—potentially into the six-figure range—would not be counted without a short extension of the ballot-receipt deadline. See ___ F. Supp. 3d, at ___, 2020 WL 5627186, *21; Electronic Case Filing in No. 3–20–cv–459, Doc. 299 (WD Wis.), p. 9.

The concurrence fails to give those findings the respect they are due. Of course, the concurrence *says* it is not committing that elementary error; according to JUSTICE KAVANAUGH, he disputes only the district court's "speculative predictions," not its statement of "historical facts." *Ante*, at 15–16. But the concurrence alternately rejects, ignores, or accepts only *pro forma* the district court's account of the facts (just the facts). In responding to this dissent, the concurring opinion acknowledges that in-person voting in Wisconsin "can pose a health risk." *Ante*, at 16. Yet in condemning the injunction, it continues to insist—how else could it reach the decision it does?—that going to the polls is "reasonably safe" for Wisconsin's citizens, contrary to the expert testimony the district court relied on. *Ante*, at 17. Similarly, the concurrence nods glancingly to increased ballot applications, see *ante*, at 16, but it fails to recount (as the district court did in detail) how that influx has created heavy backlogs and prevented ballots from issuing in timely fashion. And it does not discuss the evidence of unusual, even unprecedented, delays in postal delivery service in Wisconsin. In short, the concurrence refuses to engage with the core of the analysis supporting the district court's injunction: that a veritable tsunami (in the form of a pandemic) has hit Wisconsin's election machinery, and disrupted all its usual mail ballot operations. And as to the supposedly "speculative prediction" that without the ballot-receipt extension as many as 100,000 timely cast mail votes would go uncounted? That estimate itself derived from the

factual findings just listed, along with the credible testimony of the elections commission's chair—all matters indisputably entitled to deference from an appellate tribunal. Those findings, and not the concurrence's substitute facts purporting to show that voting in Wisconsin is safe and easy, should properly ground today's decision.[5]

A related flaw in the concurring opinion is how much it reasons from normal, pre-pandemic conditions. Cf. *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ___, ___ (2020) (Ginsburg, J., dissenting) (slip op., at 4) ("The Court's suggestion that the current situation is not substantially different from an ordinary election boggles the mind") (internal quotation marks omitted). A "reasonable election deadline," the concurrence says, "does not disenfranchise voters." *Ante*, at 10. I have no argument with that statement, even though some voters may overlook the deadline. See *Rosario* v. *Rockefeller*, 410 U. S. 752, 757–758 (1973). But what is "reasonable" in one set of circumstances may become unreasonable in another. And when that switch occurs, a constitutional problem arises. So it matters not that Wisconsin could apply its ballot-receipt deadline when ballots moved rapidly through the mails and people could safely vote in person. At *this* time, neither condition holds—again, according to the district court's eminently believable findings. Today, mail ballots often travel at a snail's pace, and the elderly and ill put themselves in peril if they go to the polls. So citizens—thousands and thousands of them—who have followed all the State's rules

—————

[5] Note as well that nothing rides on the exactness of the district court's estimate. Suppose that without the ballot-receipt extension, only (only?) half as many votes would be discarded as the district court thought. The court's decision would have remained the same, and so too everything I say here. But as for the concurrence? Who can know? JUSTICE KAVANAUGH does not reveal how many uncounted votes he thinks would violate the Constitution. Nor does he suggest how many votes short of that level will be discarded because of the Court's decision today.

still cannot cast a successful vote. And because that is true, the ballot-receipt deadline that once survived constitutional review no longer does.[6]

That deadline, contrary to JUSTICE KAVANAUGH's view, now disenfranchises Wisconsin citizens—however much he objects to applying that term here. Far from using the word "rhetoric[ally]," *ante*, at 15, I mean it precisely. During COVID, the State's ballot-receipt deadline and the Court's decision upholding it disenfranchise citizens by depriving them of their constitutionally guaranteed right to vote. Because the Court refuses to reinstate the district court's injunction, Wisconsin will throw out thousands of timely requested and timely cast mail ballots. And today's decision does not stand alone. In other recent cases as well, the Court has halted injunctions necessary for people to cast ballots safely. See *Merrill* v. *People First of Ala.*, *ante*, p. ___; *Merrill* v. *People First of Ala.*, 591 U. S. ___ (2020); *Republican National Committee*, 589 U. S. ___.[7] As the

——————

[6] The concurrence is wrong to view that conclusion as casting doubt on all similar deadlines in all other States. See *ante*, at 10. The district court rested its constitutional judgment, as I would too, on a confluence of factors: COVID conditions in Wisconsin, the scarce time between the State's ballot-application and ballot-receipt deadlines, evidence about in-state mail delivery and the administrative capacity of state election offices. See *supra*, at 2–3, 8–9. In another State with all the same facts, the same result should obtain. But in another State with different facts—say, a less intense outbreak of COVID, an earlier ballot-application deadline, faster mail delivery, and better staffed and funded election offices—the constitutional analysis should come out a different way.

[7] At the same time that JUSTICE KAVANAUGH defends this stance by decrying a "federal-judges-know-best vision of election administration," *ante*, at 10, he calls for *more* federal court involvement in "reviewing state-court decisions about state [election] law," *ante*, at 9, n. 1. It is hard to know how to reconcile those two views about the federal judiciary's role in voting-rights cases. Contrary to JUSTICE KAVANAUGH's attempted explanation, neither the text of the Elections Clause nor our precedent interpreting it leads to his inconstant approach. See *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. 787, 817–818 (2015); *Smiley* v. *Holm*, 285 U. S. 355, 372 (1932).

COVID pandemic rages, the Court has failed to adequately protect the Nation's voters.

*     *     *

For all these reasons, I would vacate the court of appeals' stay. The facts, as found by the district court, are clear: Tens of thousands of Wisconsinites, through no fault of their own, may receive their mail ballots too late to return them by Election Day. Without the district court's order, they must opt between "brav[ing] the polls," with all the risk that entails, and "los[ing] their right to vote." *Republican National Committee*, 589 U. S., at ___ (Ginsburg, J., dissenting) (slip op., at 6). The voters of Wisconsin deserve a better choice.